**BURNDY CORPORATION**

v.

**TELEDYNE INDUSTRIES, INC.**

**Civ. No. B–82–656 (PCD).**

United States District Court,
D. Connecticut.

April 10, 1984.

---

Francis J. Murphy, Hopgood, Calimafde, Kalih, Blaustein & Judlowe, New York City, for plaintiff.

John McN. Cramer, Thomas C. Wettach, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for defendant.

## MEMORANDUM OF DECISION

DORSEY, District Judge.

Plaintiff's action brought under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125, asserts false advertising and unfair competition. Diversity of citizenship is found. 28 U.S.C. § 1332. Jurisdiction is found.

Defendant did misrepresent the qualities of its products as of June 1982 and for a period of time prior thereto. The plaintiff has not, however, proven its entitlement to damages or the relief prayed.

Plaintiff and defendant manufacture electrical connectors, including split bolt connectors, devices which tightly compress two electrical conductors, i.e. wires or cables. The contact permits the flow of electricity from one conductor to another. Of crucial importance is the reduction of resistance to the flow of electricity through the connection because with resistance the efficiency of the transmission of electricity is reduced and heat is generated. The latter phenomenon has a destructive capacity in the conductors, the connector, and structures proximate to the connection.

Aluminum has come to be used as a conductor of electricity. However, it has a characteristic of changing its form that can be overcome by accommodating features in a connector.

Underwriters Laboratory (UL) is an independent, non-profit entity which establishes standards in the electrical field. Electrical fixtures and devices are tested against applicable standards and, if successful, may be marketed as "UL approved." To adapt to the use of aluminum conductors, in 1978, UL, having previously used an all-inclusive split bolt connector standard, number 486, adopted a more stringent standard, 486B, applicable to split bolt connectors to be used with aluminum conductors. The 486B standard was to become effective in August 1981 as to connectors which were to be used with certain sized wires and later as to all other size connectors. UL approval is advantageous as it is relied on by many consumers.

Plaintiff developed a line of connectors, of various sizes, designed to meet the performance requirements of standard 486B, which in late 1981, it was prepared to market. Its connectors were approved by UL. Defendant did likewise. Both sought market enhancement of their respective connectors by publication of the UL approval. Defendant priced its comparable sized connectors lower than plaintiff.

Defendant's 486B connector was made up of several components. As designed, its sizes SW5, 6 and 7 met the standard. As of June 1982, its SW6 and 7 connectors, tested first by plaintiff then also by UL and by defendant, were found not to meet the standard. Subsequent testing of the SW5 connector, particularly in 1983, demonstrated that it was not in compliance. No testing prior to July 1982 demonstrated the noncompliance of the SW5 connector. The components of defendant's SW5, 6 and 7 connectors were found, in July of 1982, to be smaller (down-sized) than their size in the design which was intended to and did meet the 486B standard and was listed with

UL. The change in the component sizes occurred in the course of production prior to July 1982 with no clear record in defendant's possession, nor evidence before the court, of the time, the reason (said to be assembly problems) nor the authorization for the changes. Plaintiff claims that defendant's marketing its connectors as UL approved was a misrepresentation that caused a diversion of sales from its products and that it is entitled to redress under the Lanham Act. Defendant denies any intentional misrepresentation and any proof of entitlement to redress and asserts plaintiff's unclean hands as a bar to any relief.

*Facts Found*

The following facts are found:

1. The dispute centers around each party's split bolt connectors used to join, through a clamping process, wires also known as conductors which carry electrical current.

2. Conductors are largely made of copper or aluminum. The latter has advantages, but maintenance of connection pressure, essential to minimize resistance and heat generation at the connection point, is difficult.

3. UL is an independent agency which develops performance standards to produce safety in electrical fixtures, conductors and other items used to transmit and use electricity.

4. Products which comply with UL standards may be represented as UL approved.

5. The "UL approved" label suggests to consumers, including the electrical trade, a standard of performance which thereby enhances the product's acceptability. In some installations, including those under municipal building codes, UL approval is almost universally essential. In other markets, such as to utilities or for export, UL approval is not significant as buyers in those markets develop their own standards.

6. UL standards are developed by testing and consultation with industry representatives and associations, and in-put through study committees. The standards are derived after careful and thorough study. Standards are usually phased in with advance notice.

7. UL had a standard for all split bolt connectors, 486. Because of problems with aluminum a more stringent standard, 486B, was developed prior to 1978. UL announced the new standard to be effective, for certain wire sizes, August 18, 1981. Connectors manufactured before August 18, 1981, were subject to the earlier standard, 486.

8. Plaintiff, Burndy Corporation (Burndy), manufactured, split bolt connectors as did defendant, Teledyne Industries, Inc., through its Penn-Union subsidiary (Penn-Union).

9. Plaintiff and defendant are dominant suppliers of split bolt connectors.

10. There are other manufacturers of split bolt connectors, including Reliable Electrical Company, Blackburn Manufacturing Company, and Mercury-Greeves Company. The capacity of each of these to produce split bolt connectors comparable to those in question and compliant with the 486B standard, at any specific date relevant to the issues herein, was not totally clear. At least Blackburn Manufacturing Company, commencing in the Fall of 1981, was advertising split bolt connectors which complied with the 486B standard. Two other sellers of split bolt connectors, Ilsco Corporation and Ideal Industries, sell private brand connectors manufactured by Burndy. There are other types of connectors which function the same as split bolt connectors.

11. Plaintiff and defendant knew of the new UL standard prior to 1981 and sought UL approval of their respective line of connectors under the more stringent standard.

12. In November of 1981, defendant attempted to sell its line of connectors to Ilsco, one of plaintiff's customers for private labelling, without success.

13. Burndy continued to sell its older, tin-plated copper connectors but marketed new, larger connectors, its KSA Series,

specifically to meet the new UL standard, 486B.

14. After the effective date of the 486B standard, Penn-Union marketed its SW Series as compliant with UL standard 486B and UL approved.

15. The four components of Penn-Union's SW5–7 split bolt connectors were originally made in Ansonia, Connecticut, but by November 1981 that facility had been phased out and components were being manufactured in Pennsylvania. The components from Ansonia produced a connector which complied with standard 486B. It is unclear when the Ansonia components for each connector size were exhausted. Upon exhaustion of components for each connector size made in Ansonia, production in Pennsylvania was accomplished using the Ansonia molds and dies. At some time, in Pennsylvania, the molds and dies from Ansonia were replaced and the replacement molds and dies produced different size components. Penn-Union phased into the production of connectors with components made in Pennsylvania commencing in November of 1981. The resulting connectors were also represented as approved under UL 486B. The changes in the molds and dies in Pennsylvania resulted in down-sizing of components of the SW5, 6 and 7 connectors with resulting inability to perform in accordance with the 486B standard. There was no evidence as to the time between Penn-Union's receipt of orders for connectors, and its delivery of products ordered, nor the appearance of the end product in the hands of distributors, wholesalers or retailers.

16. Connectors which were composed of components made in Ansonia, or in Pennsylvania using Ansonia molds and dies, were in accordance with the design size submitted and tested for compliance with 486B and in fact met the standard. The down-sizing occurred in components manufactured in Pennsylvania commencing at various times for the several sizes of connectors in or after November 1981, whenever the components made in Ansonia, or in Pennsylvania with the Ansonia molds and dies, came to be exhausted. Different size connector components were used up at different times. When a particular size component made in Ansonia, or with the Ansonia molds and dies, was exhausted, production of that size component was commenced in Pennsylvania. There is no evidence as to when, before July 1982, any particular size connector came to consist entirely of down-sized components.

17. In June 1982, testing by Burndy demonstrated non-compliance of some SW6 and 7 connectors. The facts were reported to UL. Its testing, then, of the SW5 did not demonstrate noncompliance. Subsequent testing by Penn-Union confirmed the noncompliance of the SW6 and 7 in July and August of 1982. In 1983, the SW5 was also found to be noncompliant.

18. Connector components are made by a stamping process, using molds and dies which are constructed from drawings which are derived from specifications. Drawings detail the sizes and configurations of the molds and dies which thus produce the desired size components and end product. Penn-Union could not and did not produce any documentation to demonstrate how the changes of the configuration and sizes of its split bolt connector components came about. Penn-Union did not have a quality control process to insure the conformity of the end product with the 486B design which was intended to and did produce compliance with the 486B standard.

19. As of June 1982, Penn-Union was selling, as UL approved, SW6 and 7 connectors which were different in size and configuration from the product originally listed with UL, were not in fact compliant with standard 486B, and thus were misrepresented as UL approved. Such marketing commenced after November 1981, but the precise or even approximate time when the SW5, 6 or 7 connectors being sold were all down-sized and thus noncompliant was not demonstrated.

20. Under the procedures for listing of products as UL approved, any change in the size or configuration which affected

product performance had to be reported to UL. Penn-Union did not report the change in size and configuration of the SW5, 6 or 7.

21. Penn-Union had a procedure to insure that only authorized changes in product design occurred in the course of production. Either that procedure was not followed or the records of how the changes occurred in the SW5, 6 or 7 were not produced.

22. There was no evidence that Penn-Union achieved any specific or substantial saving in the cost of connectors through down-sizing. A smaller amount of material was required for the down-sized connectors, but plaintiff's evidence did not demonstrate a quantified cost saving.

23. Down-sizing the SW6 and 7 altered their performances in the amount of heat absorbed and disseminated such that the down-sized connectors did not comply with standard 486B.

24. Given the deficiency in at least the SW6 and 7, UL did not determine the existence of a general hazard to the public sufficient to require a recall or community wide publicity campaign with respect to the down-sized connectors. While it cannot be decided on the record presented to the court that no appreciable damage to the community is created by the under-sized connectors, the record contains nothing to support a finding of a substantial hazard to users of the down-sized connectors which did meet the 486 standard. At the conclusion of the trial, plaintiff was invited to supplement the record in this regard. Nothing was added.

*Conclusions of Fact*

25. Defendant's SW6 and 7 split bolt connectors were being made of down-sized components before June 1982, but the precise or even estimated date of transition from design-size to down-size in any particular size connector was not shown. Down-sized connectors did not comply with the 486B standard and thus they were not the product approved by UL. Holding them out to be UL approved constituted a false representation.

26. Changing the size of the manufactured parts required a change in the molds and dies used. Such a change could only result from a conscious decision of an employee of defendant. Defendant's manufacturing process would not change a component size without a design or plan recording the change and providing the tool maker with the measurements and configuration to which a mold or die was to conform. The lack of any such record raises doubts as to the candor of Penn-Union's employees as to their knowledge of the change. Collectively, Penn-Union's employees had knowledge of the change in the size of the split bolt connectors and the resulting noncompliance, or at least the probability of noncompliance, with standard 486B.

27. One, and perhaps two manufacturers, prior to July 1982, had split bolt connectors compliant with standard 486B for sale, probably starting in latter 1981. Plaintiff has not proven that, other than Penn-Union, it was the only manufacturer of split bolt connectors for aluminum conductors from September 1981 to June 1982, which complied with UL standard 486B. While the evidence that Blackburn, Reliable and Mercury-Greeves were in the market with a split bolt connector compliant with 486B was not definitive, there was sufficient evidence to raise a substantial doubt as to plaintiff's claim that it, exclusively, in the period in question, was the source of a 486B compliant split bolt connector. Thus plaintiff was short of its burden of proof that other than Penn-Union it was the only source of such a connector during that period. *See* Plaintiff's Exhibit 37. As 486B was not applicable to defendant's sizes SW1–4 in and prior to June 1982, plaintiff was not the exclusive source of 486B connectors in that size range.

*Discussion*

Neither at trial nor in its brief has plaintiff claimed common law unfair competition and thus this case will be treated as solely

founded on the Lanham Act, as did the parties.

In the builders' market the UL listing is material and significant as a sale factor. It represents a performance standard of an independent agency relied upon by consumers as based on that agency's credibility.

The claim is limited to September 1981 through June 1982. In June and July 1982, SW6 and 7 connectors were found not to comply with standard 486B as a result of having been down-sized from their design-size and configuration. They were stamped and marketed as compliant. Defendant claims that it should not be found in violation of Section 43(b) of the Lanham Act, 15 U.S.C. § 1125, absent a corporate intent to misrepresent the product, the want of improper motivation in the down-sizing, and the absence of knowledge of the down-sizing on the part of those responsible for communication to UL. The process by which the down-sizing necessarily occurred and the absence of normally kept records which would have documented how the down-sizing occurred, strongly suggests that within the ranks of defendant's personnel more is known than was put in at trial. It is not at all clear that the down-sizing was intended either to strip the product of its ability to comply with 486B in disregard of the 486B standard.

█ Whatever led to the down-sizing, the facts must be judged from the view of the misled consumer. *Coca Cola Co. v. Tropicana Products, Inc.,* 538 F.Supp. 1091 (S.D.N.Y.), *rev'd on other grounds,* 690 F.2d 312 (2d Cir.1982); *Walker-Davis Publications, Inc. v. Penton/IPC, Inc.,* 509 F.Supp. 430 (E.D.Pa.1981). It is enough if a material false statement is made about a product. Advertisements which are not technically false but also lead to a mistaken public belief would constitute a misrepresentation. *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 204–05 (2d Cir.1979); *Consumers Union of U.S., Inc. v. General Signal Corp.,* 724 F.2d 1044 (2d Cir.1983). Falseness may be found in the tendency of a description to be false. *Loctite Corp. v.*

*National Starch & Chemical Corp.,* 516 F.Supp. 190 (S.D.N.Y.1981); *see Rare Earth, Inc. v. Hoorelbeke,* 401 F.Supp. 26, 38 (S.D.N.Y.1975). Defendant, in June of 1982, was marketing the SW6 and 7 connectors as compliant with 486B. They were not. It follows that Section 43(a) was violated.

█ Plaintiff was a competitor. It has standing to complain of defendant's violation. *See Spring Mills, Inc. v. Ultra-cashmere House, Ltd.,* 689 F.2d 1127 (2d Cir. 1982). It may recover damages proven to have resulted from misrepresentation, the false advertising. *L'Aiglon Apparel v. Lana Lobell, Inc.,* 214 F.2d 649 (3d Cir. 1954); *Alfred Dunhill Ltd. v. Interstate Cigar Co.,* 499 F.2d 232, 237 (2d Cir.1974); *Vidal Sassoon, Inc. v. Bristol-Myers Co.,* 661 F.2d 272 (2d Cir.1981). Title 15 U.S.C. § 1125 created a special, limited cause of action intended to protect against unfair competition by false advertising. *Colligan v. Activities Club of New York, Ltd.,* 442 F.2d 686 (2d Cir.1971), *cert. denied,* 404 U.S. 1004, 92 S.Ct. 559, 30 L.Ed.2d 557 (1971); *Metric & Multistandard Components Corp. v. Metric's, Inc.,* 635 F.2d 710 (8th Cir.1980).

### Unclean Hands

█ Defendant is correct in asserting that if plaintiff has acted such that the doctrine of unclean hands was factually established, plaintiff could be refused redress. *Perfect Fit Industries, Inc. v. Acme Quilting Co.,* 646 F.2d 800, 805, 806 n. 5 (2d Cir.1981); *Haagen Daz, Inc. v. Frusen Gladje Ltd.,* 493 F.Supp. 73, 76 (S.D.N.Y.1980). Defendant's evidence does suggest some improper labelling by plaintiff. However, defendant has not proven such an extensive course of improper conduct that the plaintiff should be barred. In short, the proof offered is insufficient to sustain a defense of unclean hands. *Markel v. Scovill Mfg. Co.,* 471 F.Supp. 1244, 1254–55 (W.D.N.Y.), *aff'd,* 610 F.2d 807 (2d Cir.1979).

*Damages*

Plaintiff has claimed relief in the following respects:

1. Costs incurred to meet defendant's unfair competition.

2. Profits lost as a result of lost sales.

3. An accounting for defendant's profits from sales while misrepresenting its products.

4. Loss of profits from tag-on sales.

5. Treble damages for willful and intention acts.

6. Attorney's fees.

7. An injunction mandating advertising to inform the public of the misrepresentation.

8. An injunction mandating a recall of products that did not comply with standard 486B.

 Plaintiff is not held to meticulous, strict proof of precise damages since the difficulty of proof is great. Plaintiff cannot meet its burden of proof on the basis of speculation. *Story Parchment Paper Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562–64, 51 S.Ct. 248, 250–51, 75 L.Ed. 544 (1931). No assessment of damages is authorized if it is not based on actually proven damages. *Donsco, Inc. v. Casper Corp.*, 587 F.2d 602, 607 (3d Cir.1978), citing *Caeser's World, Inc. v. Venus Lounge, Inc.*, 520 F.2d 269 (3d Cir. 1975); *Foxtrap, Inc. v. Foxtrap, Inc.*, 671 F.2d 636 (D.C.Cir.1982); *Herman Schwabe, Inc. v. United Shoe Machinery Corp.*, 297 F.2d 906 (2d Cir.), *cert. denied*, 369 U.S. 865, 82 S.Ct. 1031, 8 L.Ed.2d 85 (1962). In cases of slight damage where the conduct of the defendant was not flagrant but justified an injunction, damages have been held to be inappropriate. *Champion Spark Plug Co. v. Sanders*, 331 U.S. 125, 131–32, 67 S.Ct. 1136, 1136, 1139–40, 91 L.Ed. 1386 (1947). Where "the defendant did not set out to steal business by confusing the public; nor did he engage in otherwise flagrant behavior," an award of damages would be dubious. *Electronics Corp. of America v. Honeywell, Inc.*, 358 F.Supp. 1230, 1234 (D.Mass.), *aff'd*, 487 F.2d 513 (1st Cir.1973),

*cert. denied*, 415 U.S. 960, 94 S.Ct. 1491, 39 L.Ed.2d 575 (1974). "Thus even if the plaintiff were able to show slight harm, the court would still not be inclined to award a money recovery." *Id.*

Plaintiff's claims will be discussed seriatim.

### I.

 Plaintiff was informed that its private brand customers were encountering price competition from defendant. Defendant's prices were 14%–15% under the plaintiff's prices. In June 1982, plaintiff discovered, and reported to UL, defendant's noncompliance with standard 486B. Plaintiff, at about the same time, advised its private brand customers, Ilsco and Ideal, that a credit would be given toward future purchases in the total amount of $118,000.00. Plaintiff asserts that the credit was necessary to meet defendant's competition which violated Section 43(a) and constituted a price reduction which lessened its profits. Plaintiff is found not to be entitled to recover the $118,000.00 for the following reasons:

A. When the credit was granted, the misrepresentation was ending. Defendant immediately stopped selling the SW5, 6 and 7 connectors as UL approved. Thus after June 1982, when the credit was actually extended, plaintiff was not meeting the unfair competition. If its price was sound, plaintiff, after June 1982, would have faced no adverse market conditions as defendant's competition in the offending sizes was not present.

B. The credits given, and taken, were in purchases of connectors in sizes that did not match the sizes of the misrepresented connectors, but were in largest part in sizes to which standard 486B did not apply. This suggests that the credit actually was an off-set to meet defendant's price which was not shown to be lower as a result of the down-sizing.

C. The price of plaintiff's KSA connectors (those that competed with the SW Series as applicable to aluminum conductors)

was higher than its KSU connectors even though the manufacturing cost of the KSA connectors was lower. This suggests, in conjunction with paragraph B above, that plaintiff was adjusting prices from levels that could not be sustained in open competition and that the credits were not necessary to meet the unfair competition of the defendant, but the price competition which was not shown to have resulted from the down-sizing of the misrepresented product.

D. The credit was at plaintiff's sale prices, not cost. It did not represent plaintiff's out-of-pocket losses.

Thus plaintiff has not proven that its credits of $118,000.00 were caused by defendant's unfair competition.

## II.

Plaintiff's claim of lost profits is based on the theory that defendant's product misrepresentation resulted in diversion of sales from the plaintiff. *See Gold Seal Co. v. Weeks*, 129 F.Supp. 928 (D.D.C.1955), *aff'd*, 230 F.2d 832 (D.C.Cir. 1956), *cert. denied*, 352 U.S. 829, 77 S.Ct. 41, 1 L.Ed.2d 50 (1957). In effect, this claim asserts:

1. That defendant's sales were the result of the wrongful representation.
2. But for the misrepresentation, the sales made by the defendant would have been made by the plaintiff.
3. Plaintiff's gross margin should be applied to each unit sold by the defendant to indemnify the plaintiff for its lost profits.

Plaintiff has not met its burden of proof with respect to this claim. While proof of damages to a certainty is not required, damages may not be speculative but are provable "as a matter of just and reasonable inference" even if only approximate. *Story Parchment Paper Co.*, 282 U.S. at 563, 51 S.Ct. at 250. *See Johnson & Johnson v. Carter Wallace, Inc.*, 631 F.2d 186, 190, 192 (2d Cir.1980).

A. Plaintiff's claim necessarily assumes that but for defendant's listing of its connectors as UL approved, it would not have sold any of the connectors and any and all of the buyers from the defendant would, instead, have purchased plaintiff's connectors. This assumption fails in the face of the evidence that two other suppliers of split bolt connectors existed, Reliance and Blackburn. The evidence of the former as a source was dubious, but plaintiff has not offered evidence to exclude the latter. Plaintiff's evidence showed that Blackburn was advertising such connectors in October of 1981 at a price below the plaintiff's price. Such evidence contradicts plaintiff's claim of an exclusive market position. Plaintiff has offered no evidence of Blackburn's inability to meet orders solicited by its advertising. Neither has plaintiff countered the evidence that other types of connectors could be used with aluminum conductors, albeit without meeting the 486B standard. Thus plaintiff has not proven that each, or any, buyer of a split bolt connector from the defendant from late 1981 through June 1982 would, by choice or by necessity, turn to plaintiff's products. Plaintiff has provided no evidence that even a reasonably identifiable percentage of defendant's allegedly ill-gotten sales would have gone to the plaintiff.

B. Plaintiff assumed that each of the defendant's SW Series sales, 477,738, in the period in question would, but for the misrepresentation, have been sold by the plaintiff. Yet the November 1981 sales occurred when, for the first time, the defendant's connector components which met the specification began to be exhausted. Thus the November sales could not be said to have been necessarily of noncompliant connectors. Plaintiff has conceded this. Transcript, p. 345. The figures included sales in July of 1982, which was outside the period of the claim.

C. The sales figures included sizes SW1–4, but these were not misrepresented. Plaintiff offered no evidence to support its claim that all buyers, finding themselves unable to buy a whole line of connectors, all sizes of which met the UL standards, would have turned to the plaintiff's products which, in all sizes, complied with the

486B standard. There was no evidence that all buyers would buy the whole range of sizes or that the buyers would buy only the compliant sizes.

D. The sales figures include the SW5 size connector. As of June 1982, there was no evidence of noncompliance by the SW5 connectors then being sold. Clearly, at later dates, particularly in 1983, undersized SW5 connectors were found to be noncompliant and were delisted as not meeting the 486B standard.

E. Plaintiff's evidence does not demonstrate that as of a date certain, or even approximate, the SW5, 6 and/or 7 connectors consisted of undersized components and were thus noncompliant with the standard. Clearly as of June 1982, the SW6 and 7's were found to be noncompliant, and thus, as of some date, when the design-size components of the SW6 and 7 connectors had been exhausted, those two sizes of connectors came to be made of down-sized components and were noncompliant with the standard. Plaintiff has left unanswered when that date occurred. Clearly it happened when the inventory of components made in Ansonia, or in Pennsylvania with the Ansonia molds and dies, were exhausted. But plaintiff has not offered evidence as to when, for any particular size connector, the proper size components were used up and the down-sized components came to be used exclusively. It is only after that occurred that the performance of any of defendant's connectors were misrepresented. On the record presented, there can be no finding that as of any particular date prior to June 1982 the defendant was selling down-sized connectors of any particular size. At best, plaintiff proved it was occurring in June 1982. Thus the farthest the proof can be stretched, allowing the plaintiff a less than stringent assessment of its proof, is to find that defendant sold 58,705 SW6 and 7 down-sized connectors in June 1982 which were not compliant with UL standard and were thus misrepresented.

F. The SW Series, while developed for use with aluminum, were not restricted to that use. There was nothing to prevent their use with copper. While down-sized SW6 or 7 connectors were falsely described as UL approved under 486B, that is for use with aluminum, they could properly be used with copper and would not be misrepresented to a buyer intending their use with copper conductors. Such a buyer would not, therefore, necessarily turn from purchasing an SW6 or 7 even if he knew that it could not properly be UL listed for use with aluminum.

G. Plaintiff's only evidence as to defendant's sales, Exhibit 76, reflected not only sales which were for 486B use but also 486 purposes. *See* Transcript, p. 45. Thus in addition to the record not sustaining the plaintiff's claim of exclusivity other than the SW Series, as discussed in paragraph F above, the sales figures presented were not solely for the relevant use, i.e. 486B, and thus would not universally have entailed a misrepresentation. There is no basis to estimate the portion of the sales made for 486B purposes as opposed to sales for 486 purposes.

H. The margin per unit claimed was $1.03. Plaintiff need not deduct, from the proceeds of any additional sales, the fixed costs which do not vary with the volume of sales. However, any additional costs which would result from additional sales, must be deducted if the plaintiff is merely to be compensated. This could only be accomplished by putting the plaintiff in the position it would have attained but for the defendant's wrong. Plaintiff's figure of $1.03 did not include costs of selling, shipping, packaging or quality control (to the extent it would be increased by additional production). These were costs which would be incurred by reason of each additional sale and would reduce plaintiff's margin. If these costs are not deducted, plaintiff would not be charged with costs it would incur as a result of additional sales. There is no evidence of the amount of these costs.

I. The margin in evidence was not calculated within the period September 1981 through June 1982, but over a twenty-

month period without showing that it could not be calculated solely for the relevant period nor that the figure would be the same for the relevant period.

J. The margin was calculated with respect to all sizes of plaintiff's KSA connectors, including sizes comparable to defendant's connectors which were not shown nor claimed to have been noncompliant with the UL listing. The margins for each KSA size were not equal. The margins for those of plaintiff's connectors which were comparable in size to the misrepresented connectors of defendant were not shown to be equal to the average margin for the entire time period.

## III.

■ In relying upon 15 U.S.C. § 1117[1] plaintiff claims it is entitled to defendant's profit from sales of the noncompliant SW5, 6 and 7 connectors from December 1, 1981, to July 1, 1982, $66,916.00. Plaintiff has not met its burden.

■ A. The statute permits recovery of defendant's profits, plaintiff's damages, and costs of the action. However, by its explicit language such are recoverable "[w]hen a violation of any right of the registrant of a mark registered in the Patent and Trademark Office shall have been

established in any civil action arising under this chapter ...." This action involves no mark registered in the Patent and Trademark Office. Plaintiff complains as the victim of unfair competition/false advertising. It has not lost a right to an exclusive marketing privilege. Had a mark been involved, an appropriation or infringement of plaintiff's property right might have been proven and thereby defendant might have been shown to have generated profits as the fruit of the misappropriation or infringement. Such is not this case. Plaintiff is entitled to be compensated, that is made whole to the extent it has proven its damage. Plaintiff asserts the right to be made whole *and* to receive defendant's profits. That would not be a compensatory recovery, but would enhance plaintiff's status beyond its actual loss by reason of its aggressive pursuit of this lawsuit. It is not the purpose of Section 43(a) (15 U.S.C. § 1125) to penalize a party, but merely to require redress for its wrongdoing. While 15 U.S.C. § 1117 has been held to extend to Section 43(a) actions for unfair competition,[2] this result has been premised, where it has been analyzed, on the concept that Congress must have intended a single range of redress and not inconsistent or different recoveries for different bases of actions brought under the Lanham Act.[3] To the contrary, there should be no recov-

1. 15 U.S.C. § 1117 provides:
 When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action....

2. *Metric & Multistandard Components Corp.*, 635 F.2d 710, 715; *Boston Professional Hockey Ass'n, Inc. v. Dallas Cap & Emblem Mfg. Inc.*, 597 F.2d 71, 75 (5th Cir.1979); *see also Donsco*, 587 F.2d 602, 607–08; *Electronics Corp.*, 358 F.Supp. 1230.

3. In *Metric*, defendant used a similar name to the plaintiff's name and copied plaintiff's catalog, thus creating a false designation of origin. The court cited *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 386 U.S. 714, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967), which was an infringe-

ment case and only dealt with the recovery of attorney's fees (which were held not allowed). The phrase from *Fleischmann*, relied upon in *Metric*, "when a cause of action has been created by statute which expressly provides the remedies for vindication of this cause, other remedies should not readily be implied," *Fleischmann* at 720, 87 S.Ct. at 1408, was clearly limiting language, particularly in view of the Court's refusal to expand the relief to include attorney's fees. The *Boston Professional Hockey* case was a trademark case. The *Donsco* case refers to profits and multiple damages in reliance on *Caeser's World, Inc.*, 520 F.2d 269, without discussing the question of whether 15 U.S.C. § 1117 should be applicable to an unfair competition case. The case of *Caeser's World* involved infringement. The *Electronics Corp.* case trial court memorandum, which was adopted on appeal, *per curiam*, determined that neither an award of damages, nor a multiple award, should be made absent proof of actual harm.

ery of profit not attributable to the unlawful use of a mark. *Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge*, 316 U.S. 203, 206, 62 S.Ct. 1022, 1024, 86 L.Ed. 1381, *rehearing denied*, 316 U.S. 712, 62 S.Ct. 1287, 86 L.Ed. 1777 (1942). Plaintiff cites *Monsanto Chemical Co. v. Perfect Fit Products Mfg. Co.*, 349 F.2d 389 (2d Cir.), *cert. denied*, 383 U.S. 942, 86 S.Ct. 1198, 16 L.Ed.2d 206 (1965), as did the court in *Cutler-Hammer, Inc. v. Standard Relay Corp.*, 328 F.Supp. 868 (S.D.N.Y.1970), *aff'd*, 444 F.2d 1092 (2d Cir.1971), where there was no discussion of the propriety of applying 15 U.S.C. § 1117 to an unfair competition case, but the *Monsanto* case was a trademark infringement case. An accounting for profit is to prevent unjust enrichment from the use of a trademark and to deter infringement. *Maltina Corp. v. Cawy Bottling Co.*, 613 F.2d 582 (5th Cir. 1980); *Monsanto Chemical Co.*, 349 F.2d 389. There is a distinct difference between a suit seeking redress for appropriation of a mark and one for unfair competition where profit disgorgement would provide redress beyond compensation. In the former case, the disgorgement of the profit would inhibit the misappropriation and prevent the retention of any profit resulting from the wrongdoing. To find a congressional intent to provide a full range of the recoveries permitted by 15 U.S.C. § 1117 in all cases brought under the act flies in the face of explicit language in the statute which unequivocally articulates its limitation to specific actions, a limitation which does not include plaintiff's cause of action. It is inappropriate and unfounded to infer an intent on the part of Congress to extend the remedies when the statutory language is explicit and contrary to any such intent.

B. If one competitor, in a false advertising case, is permitted to recover the wrongdoer's profits, there is no preclusion to another competitor seeking the same redress. If plaintiff is correct, a false advertiser could pay over its profits more than once. There is no provision for allocating a defendant's profits among several claimants. For these reasons, a wronged competitor should be restricted to its proven

damages for then, no matter how many claims are made, a wrongdoer would solely pay compensation to each complainant for their respective damages.

C. Defendant's claimed profit figure was derived from its total profit on all SW connector sales, from which the plaintiff has subtracted the profit on the SW1–4 sales. This approach is vulnerable to the question of whether any SW5 connectors were deficient in and prior to June 1982. The only evidence as to the SW5 connectors is that those being made in 1983 were clearly found to be deficient and delisted. Indeed, plaintiff's tests of the SW5, per Mr. Lai, indicated that the samples tested in 1982 met the 486B specification. Thus it cannot be said that the plaintiff has proven that in the period in question the SW5 connectors sold were noncompliant with 486B. Thus no damages can be found, premised on the sale of those connectors.

D. The profit figure submitted covered the entire period from December 1981 through June 1982. The analysis of section II above, concerning the want of proof as to the probable point from which the SW6 and 7 connectors shipped were all noncompliant, applies here. There would be no sound basis for finding any profit entitlement except perhaps with respect to the sales of SW6 and 7 connectors in June of 1982.

E. Plaintiff's only claim pertains to sales to the construction trade where, and where only, the proof showed the UL listing was material. Defendant also sold connectors to the export trade and to the utility market where the UL listing was not material. The profit of which there is evidence was derived from sales to the construction trade and to utilities, the export sales being excluded. Thus the profit in evidence was derived in part from sales to utilities as to which plaintiff cannot, and does not, claim impropriety. Plaintiff has offered no proof of the portion of the profit which came solely from construction sales, either in terms of specific figures nor in approximate shares. Thus plaintiff has not proven the profit which resulted from de-

fendant's sales of improperly labelled connectors. Consideration of this claim requires proof which eliminates speculation as to the profit derived from the wrong doing.

F. The profit in evidence was not reduced by any tax obligation on the part of the defendant. Thus defendant's profit before taxes was not shown. If an award was based on profits after taxes it would result in defendant paying the taxes, losing the profit to plaintiff without recouping the taxes paid.

## IV.

█ Plaintiff has claimed that it would have realized "tag-on" sales, that is sales of other related products purchased to go with or at the same time as connector sales. This was estimated to come to 30% of the connector sale. This was based on the testimony of Mr. Pluff, who asserted that in turn it was based on a comparison of 1983 sales of associated products and split bolt connector sales, eliminating the sales of connectors for copper use. There was no evidence of specific experience demonstrating such sales, nor that the 1983 figures would be valid for the period 1981 to 1982. There was no detailed analysis of how the study was made and the assumptions on which it relied were not adequately substantiated. Thus, for example, it might be questioned as to whether a purchase of an individual, but allegedly associated, product contemporaneous with a sale of connectors was prompted by the purchase of the connectors or vice versa. Similarly it might be questioned as to whether such a purchase was substantially the result of the independent merit of the associated product and was merely coincidental to the connector sale. To find plaintiff entitled on the basis of this record by reason of expectable "tag-on" sales is too speculative to be warranted.

## V.

█ The claims for multiple damages and/or attorney's fees may be dealt with together, as each are reserved for those cases where the defendant's wrong is willful or, in the instance of attorney's fees, the conduct of the lawsuit is obstructive and not in good faith. *W.E. Bassett Co. v. Revlon, Inc.*, 435 F.2d 656 (2d Cir. 1970); *Vuitton Et Fils S.A. v. Crown Handbags*, 492 F.Supp. 1071 (S.D.N.Y. 1979), *aff'd*, 622 F.2d 577 (2d Cir.1980); *Cutler-Hammer, Inc.*, 328 F.Supp. 868. Attorney's fees have been specifically held not recoverable under the Lanham Act. *Fleischmann Distilling Corp.*, 386 U.S. 714, 87 S.Ct. 1404, 18 L.Ed.2d 475. Plaintiff's proof clearly sustains the finding that misrepresentations were made by the defendant during a period of time in and perhaps prior to June 1982. Further the down-sizing which resulted in the misrepresentations resulted from a conscious decision by someone in the course of defendant's production. They were not accidental. No saving was proven to have accrued from the down-sizing. It is clear that a lesser amount of material was used but that cost has not been quantified. Defendant had not fully explained how the down-sizing occurred, particularly when it should not have occurred, according to defendant's evidence and the procedures which defendant established, alleges were followed and were intended to prevent such an occurrence. On the record presented, it cannot be said that the defendant's production personnel deliberately down-sized the connectors with total or even substantial disregard for the necessity that the connectors comply with standard 486B nor that the marketing personnel advertised the connectors with knowledge that the down-sizing had reduced their capacity below standard 486B. While defendant's procedures were sloppy and its inability to document and explain how the down-sizing occurred raises serious doubts about the denials of more information being available, these factors do not supply the necessary level of proof on which to find an entitlement to either multiple damages and/or attorney's fees on the grounds asserted. *See Boston Professional Hockey Ass'n*, 597 F.2d 71, 77–78.

## VI.

Plaintiff has demanded injunctive relief in the form of:

■ A. Advertisements which would reasonably correct buyers' erroneous assumption that defendant's products were entirely compliant with the UL standard and approval. Clearly this relief would accrue to the marketing advantage of the plaintiff. It would be justified if the misrepresentations continued or if their effect continued such as to produce a substantial continuing adverse affect on plaintiff. Plaintiff has not shown any such continuation of defendant's conduct nor any adverse current impact. Defendant delisted the SW5 in 1983 and terminated sales of SW5, 6 and 7 connectors in July 1982 until the down-sizing was corrected, at least insofar as the SW6 and 7 were concerned. UL appeared to have been satisfied that the impropriety was corrected promptly. Nothing in the record suggests to the contrary. Thus no basis exists for a finding of continued wrongdoing by the defendant. *See Electronics Corp.,* 487 F.2d 513, 514. Further, plaintiff has offered no evidence of any current effect of the terminated wrongdoing. *See Warner-Lambert Co. v. F.T.C.,* 562 F.2d 749, 762 (D.C.Cir.1977), *cert. denied,* 435 U.S. 950, 98 S.Ct. 1575, 55 L.Ed.2d 800 (1978). The advertisements demanded would not off-set the wrongful conduct, the effect of which has run its course, nor would it assure a fully knowledgeable consumer. Rather, it would tend to confuse or misinform the public as to defendant's products which can now properly be advertised as UL listed.

■ B. A recall would be proper to protect the public from a continuing hazard. The down-sized connectors were, until August 18, 1981, properly manufactured as UL approved as they apparently met the previously applicable standard, 486. After August 18, 1981, without limit, 486 compliant connectors could be sold as UL approved as long as they met that standard if they were manufactured before August 18, 1981. UL thus allowed a phase-in of the requirement for higher performance connectors after taking several years to determine the requisite performance level. This suggests that UL determined the need for raising the performance level to enhance the safety of the connectors as opposed to finding an immediate hazard in the continued use of connectors which did not rise to the 486B standard. UL's determination in this regard was reiterated in its dealing with the mislabelling in June of 1982, eleven months after standard 486B became effective. While the UL determination that a recall was not necessary is not controlling, it is nonetheless entitled to considerable weight as to the existence of a hazard in the continued use of the down-sized connectors. At trial, counsel were specifically charged with bringing to the attention of the court any further evidence that reflected the existence of a hazard which a recall would rectify. Nothing further has been offered. The plaintiff has thus failed to prove the existence of circumstances and in particular a hazard which would warrant a recall. Plaintiff has not proven that in the ordinarily, expectable use of the connectors, a hazard exists. This is not to say that such a hazard does not exist, but only that the record does not demonstrate so. If the catastrophic fire postulated by the plaintiff does occur, its prevention will not have taken place solely because of the failure of defendant to recall the product nor UL's determination not to order a recall, but because the plaintiff has not shown the likelihood of such a catastrophe. The court stands ready to respond to a factual showing that hazards exist and should be rectified, but in the absence of such showing, no injunction as requested is appropriate.

Accordingly, plaintiff having proven defendant's violation of 15 U.S.C. § 1125, but having failed to prove that any significant, actual damages were sustained, may recover no damages. The court finds no authority for nominal damages being awardable under Section 43(a).

SO ORDERED.