**SANBORN MANUFACTURING COMPANY, Plaintiff,**

v.

**CAMPBELL–HAUSFELD/SCOTT FETZER COMPANY, Defendant.**

No. Civ. 4–92–50.

United States District Court, D. Minnesota.

June 3, 1992.

See also 997 F.2d 484.

Jerome B. Pederson, Daniel J. Maertens, Fredrikson & Byron, Minneapolis, MN, for plaintiff.

Mark Gregory Schroeder, Alan Hall Maclin, Briggs & Morgan, St. Paul, MN, for defendant.

MEMORANDUM OPINION AND ORDER

DIANA E. MURPHY, Chief Judge.

Sanborn Manufacturing Company, Inc. (Sanborn) brought this action against Campbell Hausfeld/Scott Fetzer Company (Campbell) alleging deceptive advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a), violation of the Minnesota Deceptive Trade Practices Act, Minn.Stat. § 325D.45, and unfair competition. Now before the court is the motion by Sanborn for a preliminary injunction.

I.

This is the third motion brought in this case commenced on January 15, 1992. On March 10, the court denied Sanborn's motion for a temporary restraining order which sought essentially the same relief requested here. On April 8, the court denied Campbell's motion to dismiss for failure to state a claim upon which relief can be granted, and Sanborn's motion for Rule 11 sanctions. Subsequently, the parties have conducted additional discovery.

The statement of facts in the prior two orders is incorporated herein by reference. Briefly, both Sanborn and Campbell manufacture air compressors and sell them to retail outlets throughout the United States. Campbell sells two models, one identified as Model HL702300AJ (the HL7023) and the other as Model WL600700AJ (the WL6007). The HL7023 is labeled as "5 Air Compressor HP Rating." The WL6007 is labeled as "3.5 Air Compressor Horsepower Rating." Campbell affixes a tag to both models indicating that they have been inspected and

approved by Underwriters Laboratories (UL).

According to UL standards, an air compressor labeled as having a horsepower greater than three and manufactured after August 30, 1991 must use an air tank certified by the American Society of Mechanical Engineers (ASME). Sanborn alleges that the two Campbell air compressor models do not comply with this UL standard since they are labeled as having a horsepower greater than three and were manufactured after August 30, 1991, yet do not use an ASME certified air tank. Campbell admits that the two models do not use ASME certified air tanks, but contends that UL has expressly approved use of its mark on the models as labeled and sold by Campbell.

The parties have now conducted discovery of documents and witnesses at UL and one witness at Campbell. According to Sanborn, this discovery shows that Campbell did not have UL approval for the labeling it has been using. Sanborn contends that Campbell's apparent reliance on verbal approval from UL concerning its labeling is belied by the documentary record and deposition testimony. The verbal approval purportedly occurred at a meeting in December 1990 and over the telephone in January 1991. Sanborn argues that the subsequent written record shows that UL approved only the label, "3.5 Air Compressor," not the label actually used, "3.5 Air Compressor Horsepower Rating." On March 9, 1991, after the purported oral approval, UL wrote to Campbell that the phrase, "3.5 Air Compressor Horsepower" would not be acceptable. On May 24, 1991, Keilholz at Campbell wrote to UL requesting approval for the label "3.5 Air Compressor" only and stated that Campbell would "not [be] wording 3 + horsepower models using non-ASME tanks with the word 'horsepower' in any way, shape or form on the actual model or its packaging, manual or sales literature." That same day, UL wrote back to Keilholz that units "marked 3.5 Air Compressor with no inference to a 3 horsepower or greater rating" would be acceptable. Michael Tetzlaff of UL testified that the phrase, "3.5 Air Compressor Horsepower Rating,"

would not have been approved and did not comply with the relevant standards.

It is undisputed that on August 27, 1991, UL issued a Variation Notice to Campbell indicating that the units in question did not comply with its standards. On November 27, 1992, UL "closed out" or cleared this variation notice. According to Sanborn, Jeffrey Dorhmann at UL testified that this clearance did not indicate approval of the label Campbell was using. The label was actually unacceptable. Another UL engineer, Anthony Bell, testified that the two phrases, "3.5 Air Compressor Horsepower Rating," and, "3.5 Air Compressor," do not convey exactly the same information. He also testified that oral approval of a label would not make it eligible for UL listing; all approvals must be reviewed by two engineers, both of whom must indicate their approval by their signature.

Sanborn has submitted an advertisement by Menards, one of Campbell's customers, offering for sale one of the models in question as a "3.5 H.P. Compressor." According to Sanborn, Tetzlaff at UL testified that such mislabeling may affect how a customer uses the unit. A customer may use a unit in commercial (rather than light duty) situations for which UL has not evaluated it, with reasonably foreseeable risks from shock, fire, or mechanical hazards.

Campbell presents a largely different version of these facts. Of central significance, however, is Campbell's decision, effective April 28, 1992, to remove the UL listing mark from further production of the air compressor models at issue. Campbell states that it is removing the words "horsepower" and/or "hp" from the two models at issue and from any other place where those words appear on these models, any instruction manual provided with these modes, and their shipping cartons. After these labeling changes are completed, Campbell may seek UL approval to reapply the UL mark to these models. Sanborn acknowledges this decision, but continues with its motion.

According to Campbell, UL provided oral approval of its proposed labelling in December 1990 and January 1991. Campbell's director of engineering, Mike Yacobi, has handwritten notes of the December meeting

confirming this. UL officials do not deny this approval, but do not specifically recall it. Keilholz believed that subsequent correspondence with UL permitted use of the word "horsepower" in the label so long as it did not immediately follow any number, such as 3.5.

Campbell notes that the August 27, 1992 variation notice stated the precise language at issue here: "(Item 1 marking is 3.5 air compressor horsepower rating.)" Campbell agreed to delete the word "horsepower" or "HP" from the cartons containing the model where this word immediately followed the number 3.5; Campbell did not discuss changing the label on the unit. UL then wrote back: "[W]e understand that two markings state '3.5 air compressor' and one marking states '3.5 hp Air Compressor.' You have agreed to obliterate the 'hp' in the latter case. Therefore, based upon the position stated in UL's May 24, 1991 letter to you, we are agreeable to our Mark appearing on units marked '3.5 Air Compressor' for this lot only." UL also stated it planned to reevaluate its May 24 position. Campbell believed this meant that its label, "3.5 Air Compressor Horsepower Rating," of which UL was aware, was acceptable at least until the May 24 position was reevaluated.

According to UL witnesses, there was no such reevaluation. Instead, on November 27, 1991, UL closed out the variation notice by stating: "Item 1 was acceptable. No revisions to the Follow–Up Services Procedure were considered necessary. The Variation Notice has been resolved." The author of this letter from UL testified that this meant the language reported in Item 1 (including the label at issue here) was acceptable to UL. Two other UL engineers testified that this letter meant that the language at issue here was acceptable.

Campbell notes that the relevant standard, UL Standard 1450, expressly excludes "household air compressors" of the type it is manufacturing. Campbell also has submitted documents from UL which it contends reflect the submission by Sanborn of an air

compressor to UL for evaluation in March 1992 which violated UL Standard 1450.

## II.

Sanborn argues that it is entitled to a preliminary injunction under the Lanham Act, 15 U.S.C. § 1125(a).[1] It contends that it is likely to succeed on the merits of its claims, since the evidence shows that UL did not approve the labeling Campbell used on the two models at issue, so that Campbell's application of the UL mark was a false representation of fact likely to cause confusion or mistake, or to deceive purchasers. Sanborn argues that irreparable harm is shown in that the false representations have a tendency to deceive, and in the actual confusion exhibited by the Menards' advertisement. The balance of harms favors Sanborn, it contends, because Sanborn and the public are harmed by Campbell's misleading labeling while Campbell has no protectable interest in being able to continue distributing these products. The public interest would be served by a preliminary injunction, since the mislabeled products pose a safety risk.

Sanborn requests an injunction prohibiting any further sale or distribution of the two models which have been manufactured after August 30, 1991, and bearing the UL label, which do not contain an ASME certified air tank. Sanborn contends that Campbell's voluntary cessation does not negate the need for this relief. Sanborn also requests that the injunction require Campbell to advise all of its customers who have purchased the air compressors that they were not approved for UL listing, to recall all affected compressors so the UL mark may be removed, and to provide Sanborn with an immediate accounting of the number and type of such compressors it has sold.

Campbell argues that there is no practical need for injunctive relief because of its recent corrective measures. There is no evidence of any likelihood of recurrence of the alleged mislabeling as would be required to enjoin the labeling now. It contends that notice to customers and recall are not appro-

---

**1.** Sanborn also bases its motion upon the Minnesota Deceptive Trade Practices Act, but because the standards for granting injunctive relief are essentially the same under the Minnesota Act and the Lanham Act, it focuses its argument here exclusively on the Lanham Act.

priate since it has now corrected any purported violation of UL standards, and notice would merely give Sanborn an unfair competitive advantage. Furthermore, there is no evidence showing any actual safety threat from the models already manufactured and marketed.

Campbell contends that Sanborn has failed to show irreparable harm without injunctive relief. It delayed in bringing suit and seeking temporary equitable relief. Any harms left after Campbell's recent actions are not irreparable. Campbell argues that Sanborn is unlikely to succeed on the merits. It has shown no actual consumer confusion. The Menards' advertisement does not show confusion over the UL mark, only, perhaps, over Campbell's label. The evidence is ambiguous at best as to whether UL approved Campbell's labeling, and Campbell's position is supported by the close out of the August 27, 1991 variation notice. Campbell contends that the balance of harms weighs against granting injunctive relief, particularly since Sanborn seeks an affirmative injunction which would alter the status quo and essentially give it all the relief it seeks from trial on the merits. The notice and recall could have a dramatic effect on Campbell's sales and reputation. It would be administratively burdensome. The accounting, to the extent relevant, can be obtained through normal discovery. Campbell argues that the public interest is not served by unnecessarily recalling products with no proven safety risk. Finally, Campbell contends that Sanborn comes to the court with "unclean hands," based on its own submission of air compressors to UL with labels that violate the relevant standards, barring equitable relief.

### III.

In ruling upon a motion for preliminary injunctive relief, the court should consider the probability that the movant will succeed on the merits; the threat of irreparable harm to the movant; the state of the balance between this harm and the injury that granting the injunction will inflict on other parties

litigant; and the public interest. *Dataphase Systems, Inc. v. CL Systems, Inc.*, 640 F.2d 109, 114 (8th Cir.1981). The plaintiff has the burden of demonstrating that it is entitled to the relief it seeks. Both the Lanham Act, at 15 U.S.C. § 1125(a), and the Minnesota Deceptive Trade Practices Act, at § 325D.45 provide specifically for injunctive relief.[2]

■ The central element of the preliminary injunction Sanborn seeks, a prohibition on further sales of the two air compressor models with the UL mark, is essentially moot at this time. It remains to be seen what changes Campbell may make with these products in the future, and whether it will apply for and receive UL approval following any changes. At the present, however, it appears that the lead argument in support of a preliminary injunction—irreparable harm due to continuing sales—has been rendered essentially moot. Furthermore, there is nothing to indicate that this voluntary cessation is inadequate in meeting Sanborn's concern. *See M–F–G Corp. v. EMRA Corp.*, 817 F.2d 410, 411 (7th Cir.1987). This element of the relief Sanborn requests should be denied.

The other three elements of the requested relief are notice to customers of past wrongful labeling, recall to remove the UL mark from models already distributed, and an immediate accounting of the products sold.

In support of its request for notice to past customers, Sanborn argues that the Menards' advertisement shows at the least that Campbell's past labeling had a tendency to deceive purchasers. It also argues that any consumer deception regarding UL approval for Campbell's units would result in immediate and irreparable injury to Sanborn's ability to compete because the UL mark enhances a manufacturer's ability to sell products.

Sanborn has not shown that it will be irreparably injured without notice to purchasers and a recall of the product. Since the UL mark is no longer being applied, Sanborn must show that the adverse effects of past (alleged) mislabeling with the UL mark have continued into the present and

---

2. The standards for injunctive relief are essentially same under the Minnesota Act and the Lanham Act and may be treated together. Sanborn does not address its third count, common law misrepresentation, in its motion for preliminary injunctive relief.

will continue into the future. The Menards' advertisement is irrelevant in this regard, since it does not concern the UL mark. Sanborn has offered no proof of continuing adverse effects from past labeling. Furthermore, whether or not Campbell enhanced its ability to compete in the past by means of its labeling in the past, Sanborn has not shown that consumer deception because of this past labeling has any effect on present or future competition between Sanborn and Campbell.

In addition, notice to past purchasers presents practical difficulties. It is not clear to whom the notice would go or precisely what it would say. In light of these difficulties, and with no specific showing as to what notice would accomplish for such past customers, the balance of harms weighs against providing this relief. Under all the circumstances, Sanborn has not shown that it is entitled to a preliminary injunction mandating notice to past customers of Campbell.

A similar result was reached in *Burndy Corp. v. Teledyne Indus., Inc.*, 584 F.Supp. 656 (D.Conn.), *aff'd* 748 F.2d 767 (2d Cir. 1984). Following a bench trial in that case, the court found a violation of the Lanham Act based on the defendant's false representation that its product complied with UL standards. The court denied injunctive relief, however, in the form of product notice to customers by way of advertisement, or in the form of product recall. The defendant had already changed its product two years earlier to conform with UL standards and had received UL approval following the changes. Here, the changes by Campbell are more recent, but the reasoning in *Burndy* is still squarely on point. Concerning notice to customers, the court wrote,

> Clearly this relief would accrue to the marketing advantage of the plaintiff. It would be justified if the misrepresentations continued or if their effect continued such as to produce a substantial continuing adverse affect on plaintiff. Plaintiff has not shown any such continuation of defendant's conduct nor any adverse current impact.... Further, plaintiff has offered no evidence of any current effect of the terminated wrongdoing.... The advertisements demanded would not off-set the wrongful conduct, the effect of which has run its course, nor would it assure a fully knowledgeable consumer. Rather, it would tend to confuse or misinform the public as to defendant's products which can now properly be advertised as UL listed.

*Id.* at 670. In the present case, Campbell has also dropped the UL mark from the products at issue. It remains to be seen what changes it may make in labeling and what the UL response might be. The same reasoning applies here as in *Burndy*, however, in the face of Sanborn's failure to show continuing adverse effects.

■ Sanborn's request for product recall should also be denied. At oral argument, counsel for Sanborn acknowledged that a recall would be logistically unwieldy and might not be possible. Sanborn has presented some testimony concerning potential safety risks should some consumer be misled by the old label and use the product beyond its capacities, but this testimony is speculative in nature. Sanborn has not produced any evidence of actual customer confusion due to the labeling, nor evidence that confusion results in misuse of the product. There is no evidence that even if the prior label were misleading, a customer had been confused, and the product had been used beyond its capacities, there would have been any actual risk to the customer. Sanborn has submitted no test results supporting any increased risk from such use. Under these circumstances, the conclusion in *Burndy* concerning product recall is applicable here:

> A recall would be proper to protect the public from a continuing hazard.... At trial, counsel were specifically charged with bringing to the attention of the court any ... evidence that reflected the existence of a hazard which a recall would rectify. Nothing further has been offered. The plaintiff has thus failed to prove the existence of circumstances and in particular a hazard which would warrant a recall.

*Id.* Here, Sanborn's speculative submissions do not support its claim that the public would be harmed absent a recall.

Sanborn has made no argument specifically supporting its request for an immediate accounting of the compressors Campbell has

sold. It appears that this information, to the extent relevant in this litigation, can be obtained through normal discovery procedures. Sanborn may move to compel discovery should Campbell prove recalcitrant, but it is to be hoped that there would be voluntary disclosure of relevant information. The request for an order for accounting should be denied, but it would be prudent for the parties to avoid the expenditure of further judicial resources on this issue.

Sanborn has failed to show any irreparable harm from failing to grant the preliminary injunctive relief it requests. The balance of harms tips decidedly against granting the relief. There would be significant practical difficulties in implementing the relief. There has been no showing that the public interest would be served by the relief. On the present record, the likelihood of success on the merits is not clear, with conflicting predictions presented by the parties. The court cannot say now that it appears likely that Sanborn will prevail on the merits, at least not sufficiently likely to support the kind of relief it requests. The motion should be denied.

The case should be referred to Magistrate Judge Lebedoff for an early Rule 16 conference so that case management deadlines may be set. The court expects the parties to cooperate in preparing the case for a trial on the merits as soon as possible.

### ORDER

Accordingly, based upon the above, and all the files, records, and proceedings herein, IT IS HEREBY ORDERED that:

1. the motion by Sanborn Manufacturing Company, Inc. for a preliminary injunction is denied;

2. the case is referred to United States Magistrate Judge Jonathan Lebedoff to conduct a Rule 16 conference as soon as possible.