**BURNDY CORPORATION,**
Plaintiff-Appellant,
Cross-Appellee,

v.

**TELEDYNE INDUSTRIES, INC., a California Corporation, Defendant-Appellee, Cross-Appellant.**

Nos. 143, 200, Dockets 84–7436, 84–7474.

United States Court of Appeals,
Second Circuit.

Argued Oct. 10, 1984.
Decided Nov. 15, 1984.

John M. Calimafde, New York City (Francis J. Murphy, Hopgood, Calimafde, Kalil, Blaustein & Judlowe, New York City, of counsel), for plaintiff-appellant, cross-appellee.

John McN. Cramer, Pittsburgh, Pa. (Thomas C. Wettach, Reed Smith Shaw & McClay, Pittsburgh, Pa., of counsel), for defendant-appellee, cross-appellant.

Before FEINBERG, Chief Judge, and MANSFIELD and KEARSE, Circuit Judges.

MANSFIELD, Circuit Judge:

Burndy Corporation ("Burndy"), which brought an action in the District of Connecticut against Teledyne Industries, Inc. ("Teledyne") alleging false advertising and unfair competition in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), appeals from a decision and judgment entered by Judge Peter C. Dorsey, before whom the case was tried without a jury. Judge Dorsey found that Teledyne had violated the Act but he denied Burndy damages and injunctive relief. 584 F.Supp. 656. We affirm.

At all relevant times Burndy and Teledyne (through its "Penn-Union" division) were competitors in the manufacture and sale of split bolt connectors ("SB connectors"), which are devices designed to facilitate the efficient flow of electricity between wire or cable conductors by reducing resistance in connections between them. Excessive resistance generates heat, which can present a fire hazard and decrease the functional capacity of the connectors and conductors. The salability of connectors is improved when they are approved by Underwriters Laboratory ("UL"), an independent industry-wide non-profit organization that establishes standards in the electrical field. SB connectors tested and approved by UL may be marketed as "UL approved," which is deemed essential by many purchasers.

Prior to August 1981, UL standard No. 486 applied to SB connectors. Because aluminum wires joined by connectors tend to "creep" or "cold flow," a phenomenon that loosens the connection and creates heat, UL developed an enhanced standard, No. 486B, which applied to connectors marketed for use with aluminum conductors. The new standard applied to connectors manufactured after August 1981. Both Burndy and Teledyne developed a line of SB connectors that met the new UL standard and advertised them as such. Teledyne priced its comparable-sized SB connectors substantially lower than those marketed by Burndy.

In April 1981, Teledyne moved its SB connector production from Ansonia, Connecticut to Edinboro, Pennsylvania. Commercial production of connectors designed to meet the UL 486B standard began in November of that year. The Edinboro plant had problems producing connectors with the Ansonia molds; as a result, the

production process was adjusted sometime following November and new molds and dies were developed and used. As the inventory of each size of Ansonia-made components and of connectors made from the Ansonia molds and tools was depleted, Teledyne began to use the corresponding items made from the new molds. The Edinboro-made connectors were advertised as complying with the 486B standard and were labeled with a code ("AL9CU") indicating their compliance. However, the redesign of the Edinboro molds and dies caused a reduction in the size of three versions of SB connectors (SW 5, SW 6, and SW 7), with the result that these were eventually proved to fail to meet the 486B standard by a wide margin. At the time, however, the down-sized products were not retested nor was the down-sizing reported to UL. There is no evidence that Teledyne sought or realized any cost savings by decreasing the size of SB connectors.

In June 1982, after Burndy became aware of complaints about certain sizes of Teledyne connectors and tested some of them, it notified UL that the Teledyne SW 6 and SW 7 connectors failed to meet the 486B standard, a finding that UL confirmed. Later testing of Teledyne's SW 5 connector in 1983 revealed that it too was not in compliance with the 486B standard. The connectors did, however, meet the original UL 486 standard. UL then contacted Teledyne, which immediately delisted the controversial connectors and ceased marketing them as meeting the UL 486B standard. Although other models made by Teledyne (SW 1 through SW 4), which had not been reduced in size, were also temporarily delisted, the listing was reinstated when testing revealed that they complied with the UL 486B standard.

At all times here involved SB connectors were made and sold in competition not only by Burndy and Teledyne but also by Reliable Electrical Company, Blackburn Manufacturing Company, and Mercury-Greeves Company. There also were in the market other types of connectors that perform the same function as SB connectors. However, the record is either unclear or devoid of proof as to the capacity and market shares of these other competitors, the extent to which their products competed against each other and the extent to which they satisfied the UL 486B standard.

In June 1982, two of Burndy's customers, Ilsco Corporation and Ideal Industries, complained to it that they had been unable to move their respective inventories of SB connectors purchased from it for resale, because Teledyne's price for its SB connectors (advertised as meeting the 486B standard) was 14.5% less than their price for Burndy's comparable connectors, which they resold under private labels. In July 1982, Burndy, not knowing whether Teledyne would delist its non-complying SB connectors, gave Ilsco and Ideal a retroactive price cut of 14.5% on their inventories, which it paid in the form of free SB connectors worth $118,000 at its regular sales prices to them. Burndy advised them that if Teledyne did not delist the non-complying SB connectors Burndy would lower its prices on future sales to meet those of Teledyne. At or about this time Teledyne delisted its non-complying SB connectors, thereby removing as a competitive factor its misrepresentation as to compliance.

On November 8, 1982, Burndy commenced the present action, claiming that Teledyne, by listing certain of its SB connectors as meeting the UL 486B standard, had engaged in false advertising and unfair competition in violation of § 43(a) of the Lanham Act. The complaint sought (1) money damages for Burndy's actual losses as a result of the false advertising from November 1981 through June 1982; (2) disgorgement of Teledyne's profits on the falsely advertised connectors during that period; (3) injunctive relief in the form of corrective advertising and a product recall; (4) multiple damages; and (5) attorney's fees. Teledyne, in turn, contended that injunctive relief should be denied because of Burndy's unclean hands in its own mislabeling of its SB connectors when in fact they failed to meet UL standards. There was evidence that some of Burndy's connectors that did not meet the UL 486B

standard were packaged and sold in boxes labeled to indicate such compliance. (The connectors themselves, however, bore a code indicating that they met only the less demanding 486 standard.)

After a 3-day non-jury trial Judge Dorsey filed a reasoned opinion in which he found that Burndy had established a violation of § 43(a) by Teledyne but had failed to sustain its burden of proving that the violation had caused it appreciable damages. He concluded that, although Teledyne's employees should have known that the change in design of the SB connectors in issue (SW 5, SW 6 and SW 7) made by it in Pennsylvania would result in a reduction in size and probable non-compliance with UL 486B, it was not shown that Teledyne acted in bad faith or with the intent of evading the UL 486B standard. Nevertheless the court concluded that since customers were misled by Teledyne's representation that SW 6 and SW 7 connectors complied with UL 486B, § 43(a) of the Lanham Act had been violated. However, Judge Dorsey further concluded that Burndy had failed to establish that its product rebates to its customers, Ilsco and Ideal, were caused by Teledyne's mislabeling since Teledyne had ceased its misconduct in June 1982 at the time when the credits were given by Burndy and since the credits would have been necessary to meet Teledyne's prices, even if Teledyne's connectors were able to perform as advertised.

The district court also rejected Burndy's claim for lost profits based on the theory that Teledyne's misrepresentation of UL 486B compliance diverted to it sales which would otherwise have been made by Burndy. Judge Dorsey found "no evidence that even a reasonably identifiable percentage of defendant's allegedly ill-gotten sales would have gone to the plaintiff," in view of the existence of other competitors and competing products in the market, or that buyers, if they had been informed of Teledyne's non-compliance as to certain sizes, would have bought all or any particular sizes from Burndy instead of from Teledyne.

Burndy's evidence was also found deficient in various other respects, including its failure to show the number of non-complying connectors sold by Teledyne or the period during which the down-sized connectors were on the market, failure to take into account that some customers might purchase Teledyne's non-complying SW 6 and SW 7 products for uses not involving the UL 486B standard (e.g., use with copper conductors), reliance on sales figures that included products not sold for uses in which compliance with UL 486B was relevant, and use of profit margin figures that were deficient in a variety of respects.

The district court rejected Burndy's claim to recovery of Teledyne's profits, based on 15 U.S.C. § 1117, which provides that upon establishing a defendant's violation of a plaintiff's registered trademark the plaintiff shall be entitled, subject to the equitable discretion of the district court, to the defendant's resulting profits, any damages sustained by the plaintiff and the costs of the action. The court held the statute inapplicable in the absence of any showing that Teledyne profited from misuse of any registered trademark owned by Burndy and thus found that there was no basis for disgorgement attributable to unjust enrichment. The court further reasoned that application of the statute to a false advertising case could result in multiple recoveries of a defendant's profits by various claimants, and that in any event Burndy was unable to segregate profits attributable to Teledyne's sales of the offending items. Multiple damages and attorney's fees were also denied for failure to prove the necessary level of willfulness on Teledyne's part or that it acted obstructively or in bad faith in its defense.

Finally, the district court denied injunctive relief on the grounds that Teledyne is now in full compliance with UL standards, it has ceased its offending conduct, there is no basis for a finding of continuing wrongdoing, and there is no threat of harm to the public necessitating a recall of mislabeled connectors.

## DISCUSSION

■ Upon this appeal we are governed by several basic principles. The first is that a plaintiff who establishes false advertising in violation of § 43(a) of the Lanham Act will be entitled only to such damages as were caused by the violation.[1] *Quabaug Rubber Co. v. Fabiano Shoe Co., Inc.*, 567 F.2d 154, 161 (1st Cir.1977); *Invicta Plastics (USA), Ltd. v. Mego Corp.*, 523 F.Supp. 619 (S.D.N.Y.1981); *see, Vuitton et Fils, S.A. v. Crown Handbags*, 492 F.Supp. 1071, 1077 (S.D.N.Y.1979) (trademark infringement and false representation), *aff'd without opinion*, 622 F.2d 577 (2d Cir.1980). Although a court may engage in some degree of speculation in computing the *amount* of such damages, particularly when the inability to compute them is attributable to the defendant's wrongdoing, *Stevens Linen Associates, Inc. v. Mastercraft Corp.*, 656 F.2d 11, 14–15 (2d Cir.1981) (copyright), causation must first be established, *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931).

■ Second, a defendant found liable for false advertising or unfair competition will be ordered to account for its profits only if certain standards are met. Title 15 U.S.C. § 1117, relied upon by Burndy as entitling it to an accounting, provides:

"When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action.... If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorney fees to the prevailing party."

Sections 1111 and 1114, referred to in § 1117, both deal with registered trademarks.[2] Assuming without deciding that § 1117, despite its express limitation, may

---

1. This statement is not inconsistent with our holding in *Springs Mills, Inc. v. Ultracashmere House, Ltd.*, 724 F.2d 352, 357 (2d Cir.1983), that damages under § 1125(a) may be recoverable in a false designation of origin case even when the plaintiff's and defendants' products do not compete directly. Actual damages in such a case could include harm to one party's reputation or goodwill caused by the actions of the other party.

2. In relevant part, §§ 1111 and 1114 read:
"§ 1111. *Notice of registration; display with mark: recovery of profits and damages in infringement suit*
"Notwithstanding the provisions of section 1072 of this title, a registrant of a mark registered in the Patent and Trademark Office, may give notice that his mark is registered by displaying with the mark as used the words 'Registered in U.S. Patent and Trademark Office' or 'Reg. U.S. Pat. & Tm. Off.' or the letter R enclosed within a circle, thus ®; and in any suit for infringement under this chapter by such a registrant failing to give such notice of registration, no profits and no damages shall be recovered under the provisions of this chapter unless the defendant had actual notice of the registration."
"§ 1114. *Remedies; infringement: innocent infringement by printers and publishers*
"(1) Any person who shall, without the consent of the registrant—
(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or
(b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive,
shall be liable in a civil action by the registrant for the remedies hereinafter provided...."

apply to actions for false advertising and unfair competition,[3] the decision as to whether a defendant will be ordered to account for its profits under § 1117 rests in the broad discretion of the district court, guided by principles of equity. *See Monsanto Chemical Co. v. Perfect Fit Prods. Mfg. Co.,* 349 F.2d 389, 395 (2d Cir.1965). Normally an accounting will be ordered only if the "defendant is unjustly enriched, if the plaintiff sustained damages from the infringement, or if an accounting is necessary to deter a willful infringer from doing so again." *W.E. Bassett Co. v. Revlon, Inc.,* 435 F.2d 656, 664 (2d Cir.1970). None of these conditions exist here. Unjust enrichment warranting an accounting exists when the defendant's sales "were attributable to its infringing use" of plaintiff's trademark, *id.,* 435 F.2d at 664, and the burden of proving this connection is on the plaintiff. *See Cuisinarts, Inc. v. Robot-Coupe Int'l, Corp.,* 580 F.Supp. 634, 640 (S.D.N.Y.1984); *cf. Vuitton et Fils, S.A. v. Crown Handbags, supra,* 492 F.Supp. at 1077.

Aside from the remedies authorized by 15 U.S.C. § 1117 for infringement of a registered trademark, we can also assume arguendo for present purposes (but without deciding) that an accounting for profits might also be awarded directly in exercise of the powers of a court of equity. *See, e.g., Truck Equipment Service Co. v.*

*Fruehauf Corp.,* 536 F.2d 1210 (8th Cir. 1976), *cert. denied,* 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976).[4] The standards for ordering an accounting, however, would not thereby be relaxed. Such relief is rarely granted and appears to have been limited to situations in which the defendant's profits represent unjust enrichment derived from diversion of business that clearly would otherwise have gone to the plaintiff, such as in instances where the defendant palmed off its goods as made by the plaintiff or otherwise infringed the plaintiff's rights rather than engaged simply in false advertising of the defendant's own product.[5]

█ A third basic principle by which we are governed is that permanent injunctive relief will be granted only upon proof of the likelihood that purchasers of the product may be misled in the future by the false advertising. *See Menendez v. Saks and Co.,* 485 F.2d 1355, 1375 (2d Cir.1973), *rev'd on other grounds,* 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976); *Electronics Corporation of America v. Honeywell, Inc.,* 487 F.2d 513, 513–14 (1st Cir. 1973) (per curiam), *cert. denied,* 415 U.S. 960, 94 S.Ct. 1491, 39 L.Ed.2d 575 (1974). Lastly, we will disturb the district court's findings of fact forming the basis of its decision only if they are shown to be clear-

---

**3.** *See Rickard v. Auto Publisher, Inc.,* 735 F.2d 450 (11th Cir.1984) (holding that § 1117 remedies are available in actions under § 1125(a) involving unregistered trademarks); *Metric & Multistandard Components Corp. v. Metric's, Inc.,* 635 F.2d 710, 715 (8th Cir.1980) (same); *see also Donsco., Inc. v. Casper Corp.,* 587 F.2d 602 (3d Cir.1978); *Electronics Corporation of America v. Honeywell, Inc.,* 358 F.Supp. 1230, 1233–35 (D.Mass.), *aff'd,* 487 F.2d 513 (1st Cir. 1973), *cert. denied,* 415 U.S. 960, 94 S.Ct. 1491, 39 L.Ed.2d 575 (1974); *Elnicky Enterprises, Inc. v. Spotlight Presents, Inc.,* 213 U.S.P.Q. 855 (S.D. N.Y.1981); *Stone v. Creative Communications, Inc.,* 216 U.S.P.Q. 261 (N.D.Ill.1981).

*But see A.S. & W. Products, Inc. v. Atlantic Steel Co.,* 207 U.S.P.Q. 251 (W.D.N.Y.1979); *Santucci Construction Co. v. Carlo V. Santucci, Inc.,* 200 U.S.P.Q. 783 (N.D.Ill.1978).

**4.** Other courts have assumed that profits could be awarded under § 1125(a) but nonetheless

found such relief inappropriate in the case at hand. *See, e.g., Manhattan Industries, Inc. v. Sweater Bee by Banff, Ltd.,* 627 F.2d 628, 630 (2d Cir.1980) (describing the district judge's decision not to award an accounting in view of the equities of the situation); *Santucci Construction Co. v. Carlo Santucci, Inc.,* 200 U.S.P.Q. 783, 788 (N.D.Ill.1978) (explicitly holding § 1117 inapplicable, but nevertheless ruling on the merits of an accounting); *DC Comics, Inc. v. Filmation Associates,* 486 F.Supp. 1273, 1284 (S.D.N.Y. 1980).

**5.** *See, e.g., Truck Equipment Service Co. v. Fruehauf Corp.,* 536 F.2d 1210, 1221–23 (8th Cir. 1976) (allowing an award of profits, although for a lesser amount than set by the district court, when defendant had violated § 1125(a) by using pictures of a competitor's trailer in its ads and by copying the trailer's distinctive external design), *cert. denied,* 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976).

ly erroneous, Fed.R.Civ.P. 52(a), which would require us first to find that they leave us "with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

■ Applying these principles, we cannot label as clearly erroneous the district court's finding that Burndy's grant of free goods allowances (valued by it at $118,000) to its customers Ilsco and Ideal, which it seeks as damages, was not caused by or attributable to Teledyne's false labeling or advertising of its SW 5, SW 6 and SW 7 connectors. There was ample evidence to support the court's finding that Burndy had not shown that its price cut (by way of free goods) to its customers was made to meet Teledyne's mislabeling of its product rather than its lower prices. Moreover, there is no evidence that if Teledyne's advertising had been revealed as false an appreciable number of its customers would have shifted their business to Burndy; even those who needed conductors that met UL 486B might have bought them from another supplier who was advertising such connectors at a lower price than Burndy's. Nor, conversely, was the district court required to infer that the stagnation in Burndy's customers' inventory was attributable to the falsity in Teledyne's advertising of certain of its SB connectors. Indeed, there is no evidence mandating an inference that if Teledyne had corrected the non-compliance it would have charged a higher price for complying connectors. As soon as the false labeling was revealed Teledyne brought its connectors into compliance without any evidence that it was forced thereby to increase prices. In short, the circumstances justified the district court's inference that Burndy's credits to its customers were required solely by Teledyne's lower price, not its mislabeling of its product.

■ Nor would Burndy be entitled to recover Teledyne's profits realized from sale of its falsely advertised SB connectors. In view of the district court's finding that Burndy had failed to show that Teledyne's profits on sales of its mislabeled SB connectors were at Burndy's expense, a finding that cannot be labeled clearly erroneous, an accounting based on unjust enrichment is precluded. Indeed, upon oral argument Burndy stated that it was no longer claiming damages on a "diversion of sales" theory. Nor does the record support a "deterrence" rationale as a basis for an accounting. Although the district court found that the knowledge of some of Teledyne's Pennsylvania plant employees that certain of its SB connectors were being down-sized should have made them aware of the probability of non-compliance with UL 486B, it concluded, "[o]n the record presented, it cannot be said that the defendant's production personnel deliberately down-sized the connectors with total or even substantial disregard for the necessity that the connectors comply with standard 486B nor that the marketing personnel advertised the connectors with knowledge that the down-sizing had reduced their capacity below standard 486B." 584 F.Supp. at 669. It further found that "[n]o saving was proven to have accrued from the down-sizing," that "the impropriety was corrected promptly," that "no basis exists for a finding of continued wrongdoing by the defendant," and that "plaintiff has offered no evidence of any current effect of the terminated wrongdoing. *Id.* at 669–70. In view of these supportable findings, coupled with the absence of any willful false representations on Teledyne's part, which is a relevant factor, *cf. Carl Zeiss Stiftung v. VEB Carl Zeiss Jena,* 433 F.2d 686, 706–07 (2d Cir.1970) (upholding liability for trademark infringement, but denying damages and an accounting), no need for deterrence is shown. For these reasons an accounting must be denied regardless whether § 1117 applies to a claim not based on infringement of a registered trademark.

■ The propriety of the district court's denial of injunctive relief, recall of non-complying SW connectors, attorney's fees and multiple damages needs little discus-

sion. Injunctive relief is wholly unnecessary in view of Teledyne's rectification of the design that led to its non-compliance and the absence of any likelihood of repetition or of any demonstrated hazard to the public from the use of the non-complying conductors.[6] In the absence of a statutory authorization, other than that in § 1117, attorney's fees would be allowable only for willful, bad faith conduct, which was not proven. Nor is this a situation warranting multiple damages or an "exceptional" case warranting an award of attorney's fees under § 1117.

The judgment of the district court is affirmed.[7]

**6.** In reaching this conclusion, we note that split bolt connectors manufactured up through August 1981, when the new standard took effect, were covered only by UL 486, a standard that the down-sized Teledyne connectors all met. Moreover, Judge Dorsey stated that he was "ready to respond to a factual showing that hazards exist and should be rectified," but that

no such showing was made. 584 F.Supp. at 670. UL itself also did not recommend a recall.

**7.** For the reasons stated in the district court's opinion, we reject the argument offered by Teledyne on cross-appeal that Burndy should be barred from suit because of its allegedly unclean hands.